Appeal No. 25-2881

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

**DEBORAH TOBACCO,**

**Plaintiff-Appellant,**

**V.**

**AVERA MCKENNAN D/B/A AVERA RESEARCH INSTITUTE,**

**Defendant-Appellee.**

*On Appeal from the United States District Court
for the District of South Dakota, Western Division
Case No. 5:23-cv-05032-CCT
The Honorable Camela Theeler, Judge*

## BRIEF FOR REVIEW
## OF APPELLANT DEBORAH TOBACCO

*Submitted by:* Stephanie E. Pochop
JOHNSON POCHOP & BARTLING
LAW OFFICE, LLP
405 Main Street
Gregory, SD  57533
(605) 835-8391
*Attorneys for Appellant*

Appellate Case: 25-2881    Page: 1    Date Filed: 12/02/2025 Entry ID: 5583425

<u>**SUMMARY OF THE CASE**</u>

In this race discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A 2000e *et seq*., Tobacco, a Native American, alleges that her employer treated her differently in the terms and conditions of employment and ultimately terminated and refused to reassign her in a pretextual reduction in force. ARI moved for summary judgment, alleging that Tobacco failed to establish her prima facie case, and that its RIF decision had been made for a legitimate budget-based reason. The District Court granted ARI's motion for summary judgment, adopting all three of its arguments.

Tobacco argues that she met her burden to establish a prima facie case of discrimination including some harm due to adverse employment actions, disparate treatment, tokenism, policy deviations, close proximity with protected activity, and misaligned termination selection criteria. She asks this Court to recognize "tokenism" as a form of circumstantial evidence that she can use to support an inference of discriminatory intent. Tobacco argues that she met her burden to produce sufficient evidence of pretext disparate treatment, tokenism, policy deviations, close proximity with protected activity, and misaligned termination selection criteria. She requests 10 minutes per side for oral argument to address whether a definition of "tokenism" should be adopted to describe a type of employment conduct that can be used to support a race discrimination claim.

Appellate Case: 25-2881     Page: 2     Date Filed: 12/02/2025 Entry ID: 5583425

# CORPORATE DISCLOSURE STATEMENT

Appellant Tobacco is an individual.

iii

# **TABLE OF CONTENTS**

**Page**

**SUMMARY OF THE CASE**…………………………………… ii

**CORPORATE DISCLOSURE STATEMENT**…………………... iii

**TABLE OF CONTENTS**…………………………………… iv

**TABLE OF AUTHORITIES**………………………………… vii

**JURISDICTIONAL STATEMENT**………………………….. 1

**STATEMENT OF THE ISSUES**…………………………….. 2

ISSUE ONE:
Applying the standard established in *Muldow v. City of St. Louis*, has Tobacco offered sufficient evidence that she suffered some additional harm due to the terms and conditions of her employment in addition to the fact that she was terminated?

ISSUE TWO:
Has Tobacco produced evidence that meets the minimal prima facie showing to create a reasonable inference that her race was a factor in the adverse actions taken against her?

ISSUE THREE:
Whether the combination of evidence that ARI's stated reason for termination was not actually used in the decision-maker's RIF selection process, of tokenism, of preferential treatment for comparative non-Native American employees, of the employer's deviation from its own employment policies, and of a close proximity between Tobacco's protected activity and termination, is sufficient to raise a genuine issue of material fact as to pretext?

**STATEMENT OF THE CASE**…………………………………..3

Appellate Case: 25-2881     Page: 4     Date Filed: 12/02/2025 Entry ID: 5583425

Overview of Tobacco's facts…………………………………………… 3

Summary of the District Court's decision………………………….. 19

**SUMMARY OF THE ARGUMENTS………………………………. 19**

**ARGUMENTS AND AUTHORITIES…………………………… 21**

    A. The standard of review……………………………………… 21

    B. The summary judgment standard…………………………… 21

    C. Evaluating disparate treatment claims at
       at the summary judgment stage ………………………………22

**ISSUE ONE: Applying the standard established in**
***Muldow v City of St. Louis,* Tobacco has offered**
**sufficient evidence that she suffered some additional**
**harm due to the terms and conditions of her**
**employment in addition to the fact that she**
**was terminated. ………………………………………………… 24**

**ISSUE TWO: Tobacco produced evidence that meets the**
**minimal prima facie showing to create a reasonable**
**inference that her race was a factor in the adverse**
**actions taken against her…………………………………… 26**

**ISSUE THREE: Tobacco has many evidentiary paths to**
**raise a genuine issue of material fact as to pretext……………… 33**

**CONCLUSION…………………………………………………… 39**

**CERTIFICATE OF SERVICE…………………………………… 41**

**CERTIFICATE OF COMPLIANCE………………………………… 42**

**ADDENDUM…………………………………………………… Separate**

    Order Granting Motion for Summary Judgment ……………..... 1-25

Appellate Case: 25-2881   Page: 5   Date Filed: 12/02/2025 Entry ID: 5583425

Judgment……………………………………………………………… 26

Certificate of Service…………………………………………………. 27

Appellate Case: 25-2881    Page: 6    Date Filed: 12/02/2025 Entry ID: 5583425

# TABLE OF AUTHORITIES

## Statutes

28 U.S.C. § 1343 ........................................................................ 1

28 U.S.C. § 1291 ........................................................................1

28 U.S.C. §1331 ........................................................................1

42 U.S.C. § 2000e-2(a)…………………………………………… ... 1 , 2, 22

SDCL § 20-13-10 …………………………………………………………..1


## Cases

*Anderson v. KAR Global*, 78 F.4th 1031  (8th Cir. 2023) ..................................... 2,34

*Bostock v. Clayton County*, 590 U.S. 644, 658  (2020)……………………… 23

*Ebersole v. Novo Nordisk, Inc.,* 758 F.3d 917  (8th Cir. 2014)…………………… 27

*Hillebrand v. M-Tron Industries,  Inc.,* 827 F.2d 363 (8th Cir. 1987)……….. 36

*Lake v. Yellow Transp., Inc*, 596 F.3d 871 (8th Cir. 2010)............................ 2, 28, 36

*Lewis v. Heartland Inns of America LLC,* 591 F.3d 1033
   (8th Cir. 2010)……………………………………………………… 2,23,24, 30, 33

*MacDissi v. Valmont Indus., Inc.,* 856 F.2d 1054 (8th Cir. 1988) ..................... 35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574  (1986)………………………………………….………… 22

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792  (1973)……... 2,19,23,24, 26,34

vii

Appellate Case: 25-2881     Page: 7     Date Filed: 12/02/2025 Entry ID: 5583425

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)……………….……23

*Morris v. Dept of Veterans Affairs,* 119 F.4th 536 (8th Cir. 2024)…………………28

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) ……… 2, 19, 20, 23, 24, 25, 26

*Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75 (1998)……...…….23

*Pye v. Nu Aire, Inc.,* 641 F.3d 1011 (8th Cir. 2011)………………………….. 35

*Reeves v. Sanderson Plumbing Prod, Inc.* 530 U.S. 133 (2000)……….. 2,30,34,36

*Regel v. K-Mart Corp.,* 190 F.3d 876 (8th Cir. 1999)........................................35

*Ridout v. JBS USA, LLC,* 716 F.3d 1079 (8th Cir. 2013)……………………34

*Smith v. URS Corp.,* 803 F.3d 964 (8th Cir. 2015) ............................................ 22

*Swierkiewicz v. Sorema N.E.,* 534 U.S. 506 (2002). ............................................ 23

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981)……… 23, 26

*Torgerson v. City of Rochester,* 643 F. 3d 1031 ( 8th Cir. 2011)……… 2, 21, 22, 34

*Yates v . Rexton, Inc.*, 267 F.3d 793 (8th Cir. 2021)............................................2, 35

**Rules**

Fed. R. Civ. P. 56(a)........................................................................... 21,22

**Other Sources**

Merriam-Webster.com Dictionary.. …………………………………….…….32

Appellate Case: 25-2881     Page: 8     Date Filed: 12/02/2025 Entry ID: 5583425

# JURISDICTIONAL STATEMENT

Tobacco filed her Complaint against Avera in the United States District Court for the Western District of South Dakota under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*, as amended by the Civil Rights Act of 1991, seeking relief from unlawful race discrimination in employment.[1] (App. 1-15; R. Doc. 1) The District Court exercised original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. On September 3, 2025, the District Court entered its opinion in an Order Granting Defendant's Motion for Summary Judgment, (App. 523-547; R. Doc. 40), and its Judgment dismissing all of Tobacco's claims. (App. 548; R. Doc. 41) On September 22, 2025, Tobacco timely filed her Notice of Appeal. (App. 540-550; R. Doc. 43) This Court exercises jurisdiction pursuant to 28 U.S.C. § 1291, which provides for jurisdiction over a final judgment from a U.S. District Court.

---

[1] Tobacco also plead a factually identical discrimination claim arising under South Dakota's Human Rights Act, found at SDCL § 20-13-10. (App. 12-13; R. Doc. 1, p. 12-13) SDHRA claims are analyzed under Title VII standards, and the parties agree the two claims are analytically indistinguishable and will share the same fate at summary judgment. (App. 535-36, R. Doc. 40, p. 12-13)

1

Appellate Case: 25-2881     Page: 9     Date Filed: 12/02/2025 Entry ID: 5583425

## STATEMENT OF ISSUES

1. **Applying the standard established in *Muldrow v. City of St. Louis,* has Tobacco offered sufficient evidence that she suffered some additional harm due to the terms and conditions of her employment in addition to the fact that she was terminated?**

   *Muldrow v. City of St. Louis,* 601 U.S. 346 (2024)

   42 *U.S.C. § 2000e-2(a)*

2. **Has Tobacco produced evidence that meets the minimal prima facie showing to create a reasonable inference that her race was a factor in the adverse actions taken against her?**

   *McDonnell Douglas v. Green,* 411 U.S. 792 (1973)

   *Reeves v. Sanderson Plumbing Prod, Inc.,* 530 U.S. 133 (2000)

   *Torgerson v. City of Rochester*, 643. F.3d 131 (8th Cir. 2011)

   *Lewis v. Heartland Inns of America LLC,* 591 F.3d 1033 (8th Cir. 2010)

3. **Whether the combination of evidence that ARI's stated reason for termination was not actually used in the decision-maker's selection process, of tokenism, of preferential treatment for comparative non-Native employees, of the employer's deviation from its own employment policies, and of a close proximity between Tobacco's protected activity and termination, is sufficient to raise a genuine issue material fact as to pretext?**

   *Lake v. Yellow Transp., Inc,* 596 F.3d 871 (8th Cir. 2010)

   *Anderson v. KAR Global,* 78 F.4th 1031 (8th Cir. 2023)

   *Yates v. Rexton, Inc.,* 267 F.3d 793 (8th Cir. 2021)

2

Appellate Case: 25-2881     Page: 10     Date Filed: 12/02/2025 Entry ID: 5583425

<u>**STATEMENT OF THE CASE**</u>

"They tokenized me, they discriminated against me, and because I was asking questions that they didn't like, they disguised my termination as a reduction in force based on budget concerns."

(App. 144; R. Doc. 32-1, Tobacco Depo at p. 33) [2]

**<u>Overview of Tobacco's facts</u>**

The Avera Research Institute ("ARI") is a part of the  Avera McKennan health care system.  (App.  310; R. Doc. 32-8, p. 896) ARI conducts health-focused research, studies, and clinical trials, including research concentrating upon Native American participants.  *Id.*  Between  2017 and 2022, ARI had expanded from having one office in Pine Ridge to adding two other office locations in Sioux Falls and Rapid City.  *Id.*  Its staff had similarly expanded from 17 people to approximately 60 people.  *Id.*

Deborah Tobacco, an enrolled member of the Oglala Sioux Tribe, began working for the Avera Research Institute ("ARI") in 2017 after being recruited by Amy Elliott, ARI's Chief Clinical Research Officer. Tobacco was one of ARI's three Clinical Research Managers and its only Native American manager. Throughout her employment, Tobacco received positive evaluations, no corrective

---

[2]  In addition to appendix page and record document page, references to deposition testimony or transcripts in the Joint Appendix are additionally indicated by the deponent's name and the page number of the deposition transcript, i.e., " (App. 223; R. Doc. 32-8, Elliott Depo at 32)" or "(App. 395, R. Doc. 32-14, Transcript at 2)."

Appellate Case: 25-2881     Page: 11     Date Filed: 12/02/2025 Entry ID: 5583425

actions, and was repeatedly recognized as a strong performer who "did whatever needed to be done" to support ARI's studies. (App. 223; R. Doc. 32-8, Elliott Depo at 32)

Because of Tobacco's ties and connections with her tribe, ARI also relied upon Tobacco to garner support for ARI grant applications from Oglala Sioux tribal leaders. (App. 145-46; R. Doc. 32-8, Elliott Depo at 35, 43) Elliott described Tobacco's unique skill set this way:

> Well, obviously Deb's American Indian and adheres to many traditional practices. She is also a mom. She is also a grandmother. She also lives and works in Pine Ridge. She has also worked in research for 20-plus years. So all of those things are very relevant to our work and I would hope would help inform how she would engage with the [ARI] team.

(App. 225; R. Doc. 32-8, Elliott Depo at 42)

ARI operates pursuant to Avera's overarching employee policies, two of which are relevant in this appeal. The first is Avera's Equal Employment Opportunity/Affirmative Action policy that prohibits race discrimination in all aspects of employment, including in layoffs. (App. 311-317; R. Doc. 32-9; App. 318-324; R. Doc. 32-10) Avera's EEO policy required that any complaints of discrimination will be investigated. *Id.* Also, the policy requires that when presented with a discrimination complaint, Avera managers are responsible to "promptly notify and provide all available information and

4

Appellate Case: 25-2881     Page: 12     Date Filed: 12/02/2025 Entry ID: 5583425

documents to HR." *Id.* A manager who fails to properly report potential violations of Avera's discrimination policies may be subject to corrective action. *Id.*

Avera also had a Reduction in Force ("RlF") policy that requires budget analysis, volunteers, and objective selection criteria for selecting staff for reduction, in addition efforts by Avera to provide the "greatest possible job security" and the "greatest possible assistance" to affected employees. (App. 338, 339; R. Doc. 32-11, p. 559-563) Avera developed a detailed RIF "toolkit" to provide checklists and to explain the RIF policy steps to managers, including the process for providing either Human Resources Transitions Services to help the affected employee find re-employment with in Avera in lieu of termination, or severance. *Id.* The only disqualifying factor that would render a RIF'd employee ineligible for career transition services was if an employee was on a corrective action, which is relevant because it is not disputed that Tobacco had never been on a corrective action. *Id.*

In 2021, Tobacco asked Elliott if Tobacco could be named as a project lead in a study Elliott was conducting that focused on Native American mothers. (App. 155-156; R. Doc. 32-1, Tobacco Depo at 65-66) According to Tobacco, Elliott responded no because it would be a conflict of interest for Tobacco to have that leadership role because Tobacco is Native American. *Id.*

5

at 65-69.  However,  ARI's Director of Community Based Research, Christy Hockett, testified that a Native American employee leading a Native American-focused study is not a conflict of interest.  (App. 305-360; R. Doc. 32-6, Hockett Depo at 71-72)

During 2022, ARI operated research sites in Pine Ridge, Rapid City, and Sioux Falls. Tobacco supervised the Pine Ridge site as a manager, where she supervised one employee,  Paul Forney, who is also Oglala Sioux.  The other two Clinical Research Managers, Rebecca Andrew and Christa Friedrich, both non-Native, supervised the other offices located in Rapid City and Sioux Falls, respectively.  Despite holding the same title and responsibilities, Tobacco was excluded from ARI management meetings that Andrew and Friedrich attended with ARI's top administrators. (App. 246-147; R. Doc. 32-8, Elliott Depo at 112-113) While Andrew and Friedrich got to have direct information from and to ARI's research scientists and its top administrators, Tobacco learned about ARI management issues through her supervisor, Jyoti Angal. (App. 145-146;  R. Doc. 32-1, Tobacco Depo at 44-45)   Tobacco had not asked to be included in the meetings because she did not know about them.  *Id.*

The harsh impact of Tobacco's exclusion from the management meetings became significant when Elliott informed administrative staff at the meeting on June 6, 2022 that ARI was required to implement a "5% improvement" in its

Appellate Case: 25-2881    Page: 14    Date Filed: 12/02/2025 Entry ID: 5583425

budget. (App. 423; R. Doc. 32-17)  There was no directive about how to obtain the 5% budget improvement, and Avera did not give ARI a directive that it needed to conduct a reduction in force.  (App.  264; R. Doc. 32-5,  Frederick Depo at 34) Instead, Elliott had the discretion about how to meet the 5% budget improvement. (App. 265; R. Doc. 32-5,  Frederick Depo at 36)

Though Angal was supposed to provide Tobacco with relevant information from the meeting, no one contacted Tobacco about the budget improvement initiative.  (App 148, 149;  R. Doc. 32-1, Tobacco Depo at 46, 49; App. 248-249; R.  Doc. 32-8,  Elliott Depo at 112-113)  Since Tobacco did not know about the Avera budget improvement  discussions, she had no ability to have input about how ARI might meet the budget improvement directive before her position was eliminated.   (App. 149; R. Doc. 32-1, Tobacco Depo at 49)

Between 2020 and 2022, Tobacco and Forney were assigned to work on ARI Research Scientist Arielle Deutsch's SYNCH[3] study, along with a team from the ARI Rapid City office that included Andrew, and two part-time research assistants named Nick Palko and Kylie Medler. (App. 418-419; R. Doc. 32-15, p. 1900; App. 153-154;  R. Doc. 32-1, Tobacco Depo at 54-55)  Tobacco and Forney were the only Native Americans on the SYNCH study team.   (App.

---

[3] SYNCH is an acronym for Systems of Native Community Health.

7

Appellate Case: 25-2881     Page: 15     Date Filed: 12/02/2025 Entry ID: 5583425

177; R. Doc. 32-2, Forney Depo at 15)

Deusch's SYNCH study required the recruitment of specific numbers of Native American participants from Pine Ridge and from Rapid City.  (App. 161, 163  R. Doc. 32-1,  Tobacco Depo at 73, 75; App. 177;  R. Doc. 32-2, Forney Depo at 15)  Originally, Deutsch had assigned Tobacco and Andrew to each be a site manager for the SYNCH study in their respective offices.  (App. 205; R. Doc. 32-4, Deutsch Depo at 14)

In early 2022, the SYNCH study encountered recruitment difficulties in Rapid City, which was Andrew's territory.  Without notifying Tobacco, Angal instructed Formey to drive from  Pine Ridge to its Rapid City office to conduct door-to-door recruitment for SYNCH. (App. 161, 163; R. Doc. 32-1, Tobacco Depo at 73–75) No one told Tobacco that Forney, the employee she supervised, had been assigned to work in Rapid City.  *Id.*

Forney was then required to make the 90+ mile drive to Rapid City  to perform SYNCH participant  recruitment.  (App. 173;  R. Doc. 32-2,  Forney Depo  at 11) Meanwhile, Forney observed that two non-Native Rapid City research assistants assigned to do SYNCH recruitment —Palko and Medler— refused to perform door-to-door recruitment because they considered the recruitment areas to be "areas where we could have been stabbed or shot."

8

Appellate Case: 25-2881     Page: 16     Date Filed: 12/02/2025 Entry ID: 5583425

(App. 173, 174, 176; R. Doc. 32-2, Forney Depo at 11, 12, 14; App.187, 190; R. Doc. 32-3, Palko Depo at 9, 18)

In March 2022, Deutsch designated Tobacco as the "sole SYNCH project lead" and instructed Tobacco to prioritize recruitment, and authorized Tobacco to assign the Rapid City SYNCH staff's job duties. (App. 704- 414; R. Doc. 32-14, Transcript at 24–31) Deutsch expressly authorized Tobacco to require Palko and Meddler to conduct door-to-door recruitment. *Id.* at 24-25, 31. Deutsch also clarified that Andrew should no longer be assigning SYNCH team duties. (App. 163; R. Doc. 32-1, Tobacco Depo at 75; App. 407-408; R. Doc. 32-14, Transcript at 24-25, 26, 31; App. 204 ; R. Doc. 32-4, Deutsch Depo at 15, 16) Tobacco shared with Deutsch that she felt that Palko and Medler might be treating her poorly because of discriminatory micro-aggressions, and that she suspected that they were refusing to do recruitment in Pine Ridge or Rapid City because of discriminatory feelings. (App. 394-410; R. Doc. 32-14, Transcript at 11-27) Tobacco described that she found her ARI workplace difficult and that speaking up about the micro-aggressions might make things worse. *Id.* at 20. Deutsch did nothing to address Tobacco's discrimination concerns.

Despite her leadership position in SYNCH, Palko and Medler refused to follow Tobacco's directives. (App.159; R. Doc. 32-1, Tobacco Depo at 69) They also declined Tobacco's invitation to accompany her to Pine Ridge, and her offer to

9

provide them with self-defense training as a means of addressing their safety concerns. (App. 192; R. Doc. 32-3, Palko Depo at 25)  Tobacco repeatedly reported these issues—including their insubordination, the disparate work duties that this forced upon Forney, and  perceived microaggression from Palko and Meddler -- to Elliott, Hockett, Angal, and HR Officer Frederick. (App. 420-42, 425-425, 428-429;  R. Doc. 32-16; 32-18; 32-20)  Despite Avera's discrimination policies, no disciplinary action,  investigation, or effort to force Palko and Medler to do their job duties followed her reports.

Moreover, Palko testified that Andrew -- though no longer a SYNCH project lead -- had covertly arranged for he and Medler to take a "pause" in their SYNCH duties.  (App. 193; R. Doc. 32-3,  Palko Depo at 26)  Even though it was not Christine Hockett's study, when Andrew came to Hockett and said, "let's not send staff members out," Hockett supported Andrew.  (App. 308; R. Doc. 32-6, Hockett Depo at 109)  In this way, Hockett and Andrew effectively overrode Tobacco's directives. (App. 193;  R. Doc. 32-3, Palko Depo at 26)

Tobacco and Forney talked with each other about the how ARI's non-Native staff were permitted to ignore Tobacco's directives for the work assignments that Forney was completing for the SYNCH study.  (App. 171-172; R. Doc. 32-2,  Forney Depo at 9-10)  Forney felt it was unfair that he and Tobacco had to drive from Pine Ridge to do SYNCH recruitment, while Palko and

10

Appellate Case: 25-2881     Page: 18     Date Filed: 12/02/2025 Entry ID: 5583425

Medler could decline to do the work in Rapid City, and refused to come to Pine Ridge for training. *Id* at 25. Forney told Tobacco that it made him feel like ARI was treating he and Tobacco like "token Indians," which he defined as being used by ARI for "publicity." *Id.* at 16. Forney expected Tobacco, as his manager, to address the workload and performance disparity that he observed. *Id.* at 19-20.

Tobacco took a direct approach to addressing Forney's complaint: at a SYNCH team meeting, Tobacco openly questioned why it was acceptable for Forney and her to drive from Pine Ridge and go door-to-door when it was not safe enough for Palko and Meddler to do so. (App. 165-166; R. Doc. 32-1, Tobacco Depo at 99-100) Tobacco also asked Angal, Deutsch, and Andrew the same thing. She testified about these pointed conversations this way:

> How come you don't want to go out to the communities, the Native American communities explicitly? And I identified those for them. Then this was after I did my own [door-to-door recruitment] trial to see if it would work. Then they both stated that they were afraid. So I said, afraid of what? And they both - both of them said - agreed that because of the recent shooting that occurred in the community in Rapid City. And so I listen165-1655;ed to them but I also told my supervisor and [Andrew], "Why is it okay for me and Paul to go out in a dangerous community? They're scared of going in a community because they're saying it's dangerous. How come it's okay for me and [Forney] to go out to that same dangerous community? What if we get shot? And yet – and yet we're being -- we're being basically forced to come up here and do the job that they are fearful of, but yet there is not concern for our safety. SO to me that was – I told [Angal] this and Dr. Deutsch this and [Andrew], that's discriminatory. That's

Appellate Case: 25-2881    Page: 19    Date Filed: 12/02/2025 Entry ID: 5583425

outright racist.  You're okay with you all being safe, but you don't care if me and [Forney] are safe….

(App. 165-166; R. Doc. 32-1, Tobacco Depo at 99-100)  Tobacco did not get a response from her managers. *Id.* at 100, 102.

At another SYNCH  team meeting, Tobacco admitted:  "I sometimes feel that I get tokenized." App. 169; R. Doc. 32-3, Palko Depo at 31)  SYNCH team members recognized this as a racial bias complaint, because SYNCH study team members regularly so discussed race and systemic racism that the topic was referred in code as "the elephant in the room."  (App. 210; R. Doc. 32-4; Deutsch Dep. at 41; App. 196;  R. Doc. 32-3; Palko Depo at 31)  Though they were not managers, Palko and Medler recognized that Tobacco's "tokenized" comment should be reported under the Avera anti-discrimination policy.  (App. 196;  R. Doc. 32-3; Palko Depo at 33)

Palko and Medler reported Tobacco's tokenism comment to both their direct supervisor and Andrew.  *Id.* at 40.  Palko testified that he and Medler never had any follow up from HR about their potential discrimination report to these two managers.  *Id.* at 34.  Neither supervisor reported the incident to Frederick as required by Avera policy.  (App. 268-270, 291; R. Doc. 32- 5;  Frederick Depo at 47, 48-49, 125)   However, Andrew did contact Frederick to report a different issue involving Tobacco during this time frame:  Andrew

12

complained to Frederick that Tobacco was creating a hostile environment for Palko and Medler by assigning them to go door-to-door. *Id.* at 117, 127. Similarly, Angal contacted Frederick to complain-- not about Palko and Medler refusing to do their SYNCH duties -- but about Tobacco's persistent efforts to try to get them to do so. *Id.* at 112-113.

On June 3, 2022, Deutsch announced that Andrew had found a more efficient way to do SYNCH recruitment, and that Forney would begin doing recruitment in the Rapid City area by Zoom so he did not have to drive to Rapid City anymore. (App. 212; R. Doc. 32-4; Deutsch Depo at 66-67) In addition to the fact that Andrew was not the SYNCH project lead, Tobacco again reported the unfair work load that Forney was carrying while his co-workers still did not have to perform their assigned duties. Tobacco's discrimination claims were documented in notes, but despite Avera's discrimination procedure, ARI managers and its HR officer took no serious action to investigate or address them. (App. 425; R. Doc. 32-18; App. 429; R. Doc. 32-20) When she did respond, Frederick somehow concluded that Tobacco's lack of understanding was the problem. (App 430-434; R. Doc. 32-21)

For example, on June 3, 2022, Tobacco again complained to Angal about the unfair treatment that Palko and Medler were receiving and how it was making an unfair distribution of work for Forney. (App. 435; R. Doc. 32-18) Frederick and

13

Elliott received this email because Angal sent it to them for Tobacco's "HR file." *Id.* However, despite Avera policy and her responsibility as the HR officer assigned to enforce it for ARI, Frederick took no action.

On June 9, 2022, Tobacco sent Frederick an email alleging that she was being retaliated against by the research team, and that her workplace was toxic. (App. 429; R. Doc. 32-20) While Frederick did interview Tobacco, she did not interview Forney or anyone else, though Frederick documented that Tobacco was persisting in her complaints about the unfair workload on Forney, about how ARI allowed Andrew, Palko, Medler to flout directives, and about how she was isolated by the SYNCH team and felt she was working in a toxic workplace. (App. 431-432; R. Doc. 32-21) On June 22, 2022, Frederick used these notes to conclude that the Rapid City staff felt they were not being heard which contributed to eroded relationships; Frederick concluded that this was more in frustration with Tobacco than retaliation. (App. 434; R. Doc. 32-22)

At a June 6, 2022 ARI Admin meeting that Tobacco was excluded from, Elliott told all the other ARI managers at the meeting (including Andrew and Friedrich) that every Avera department was required to find a 5% budget improvement. Elliott had the discretion to decide that ARI would have a reduction in force to meet its 5% budget improvement. (App. 265; R. Doc. 32-5; Frederick Depo at 36) On June 29, 2022, Elliott made the decision to eliminate

14

Tobacco's position as a RIF reduction: Elliott described it to her supervisor as the action she chose to take to meet the budget improvement directive, and she sought to do it as soon as possible. (App. 436; R. Doc. 32-23)

Frederick instructed that Elliott that she needed to comply with Avera's RIF policy. (App. 272, 274; R. Doc. 32-5, Frederick Depo at 62, 74; App. 232-233; R. Doc, 32-8, Elliott Depo at 55, 57) Avera's RIF policy checklist requires a detailed budget analysis as the first step in implementing a RIF. (App 359-360; R. Doc. 32-11, 552, 554) Elliott significantly deviated from this policy requirement: Elliott admits that she did not (ever) know how much in savings was needed to reduce the ARI budget by 5%. (App. 241; R. Doc. 32-8, Elliott Depo at 90) She "did not approach the RIF with a dollar amount in mind," and she concedes that she was not even aiming for a target number when she selected Tobacco to be RIF'd. *Id.* at 90, 102.

The RIF policy also requires managers to first ask for volunteers. Elliott ignored this part of the RIF policy. (App. 243, R. Doc. 32-8, Elliott Depo at 58; App. 32-11; R. Doc. 15) The RIF policy has objective criteria to be considered when an employee is selected, but Tobacco was one of ARI's most senior employees, had a good performance history, had no disciplinary actions or attendance problems, had special skills due to her connections in her Tribe and community, and her only communications had been the issues about discrimination

Appellate Case: 25-2881    Page: 23    Date Filed: 12/02/2025 Entry ID: 5583425

complaints. (App. 227-229; R. Doc. 32-8, Elliott Depo at 46-48) For example, when Elliott told Deutsch about her decision, Deutsch told Elliott that she was afraid that losing Tobacco would affect her grants and future projects she wanted to do in Pine Ridge. (App. 208; R. Doc. 32-4, Deutsch Depo at 29)

Tobacco was selected as the only ARI employee RIF'd nonetheless. While Elliott set a very short timeline for the termination, (App. 250; R. Doc. 32-8, Elliott Depo at 140), her actions were at odds with two other provisions of the Avera RIF policy. First, the Avera RIF policy's "greatest possible job security" and "greatest possible assistance to the employee in locating other suitable employment" language means that Avera wants to retain all employees and not have job reductions. (App. 271; R. Doc. 32-5, Frederick Depo at 57) Second, to further that standard, Avera's RIF policy requires consideration of whether the selected employee qualifies for Human Resources Transition Services. (App. 340-341; R. Doc. 32-11, p. 560) This benefit would have allowed Tobacco to employed for up to two months to find replacement employment within Avera. *Id.*

Neither Frederick nor Elliott claimed that Tobacco was disqualified from receiving Human Resources Transitions Services since her position was RIF'd. (App. 237; R. Doc. 32-8; Elliott Depo at 65) Elliott described Tobacco's qualification for career transition benefits this way:

Appellate Case: 25-2881    Page: 24    Date Filed: 12/02/2025 Entry ID: 5583425

Q. [Ms. Pochop]   Okay.  And your - one of the decisions
that you apparently made was that the human
resources transition services would not apply to Deb.
That's why she was offered the severance.  Am I
understanding your testimony correctly?

A. [Elliott]:  I'm  not- I wouldn't say did not apply. I would
say that as we walked through the course of action, that
we settled on Severance B.

*Id.*   Instead, Frederick testified that Avera's transition services were not offered

to Tobacco -- not because she did not qualify for the benefit – but because

Frederick and Elliott decided that there were no jobs to transfer or reassign

Tobacco to in Pine Ridge, that there were no manager positions or any "like

position" in Tobacco's pay scale, and that they had given Tobacco a severance

package. (App. 273, 275; R. Doc. 32-6; Frederick Depo at 66, 75; App. 230-

231, 238; R. Doc. 32-5, Elliott Depo at 51-52,  67)

Yet there is no Avera policy that requires a transfer or reassignment to be

made within the same Avera facility: in fact, the AVERA RIF transfer and

reassignment policy anticipates that an employee may transfer to an entirely

different department, and that the only criteria is "a job match for the employee's

knowledge and skill." (App. 359-360;  R. Doc. 32-11, p. 561)  Neither is there an

Avera policy that requires a transfer or reassignment to be into a like or lateral

position:  the Avera transfer and reassignment policy anticipates that an employee

may take a position that pays less.  (App. 340;  R. Doc. 32-11, p. 561; App.  375; R.

17

Doc. 32-12; App. 280; R. Doc. 32-5, Frederick Depo at 81; App. 236; R. Doc. 32-8, Elliott Depo at 61) Elliott explained that "[Tobacco] would not have gotten severance if we had offered one of those open positions to her." *Id*. at 91. However, Elliott could not explain why she thought giving Tobacco a one-time severance payment was better than helping her have an Avera job with ongoing wages, seniority, and benefits. *Id.* at 92.

On July 5, 2022, Elliott, Angal, and Frederick phoned Tobacco, who was working in her office in Pine Ridge, to inform her that her position was eliminated, that she was discharged from employment immediately, and that she would get a severance payment. (App. 150; R. Doc. 32-1, Tobacco Depo at 50) Tobacco was surprised as she had not being included in the budget improvement discussion. *Id.* at 46, 48, 49. She asked Frederick: "Is this because of discrimination, that I reported to you, the racism?" *Id.* at 50-51. Tobacco was instructed her to leave her ARI property on the table and go. *Id.* at 50-51.

At the time of the RIF call, it is not disputed that there were numerous open positions in ARI's Rapid City and Sioux Fall offices, including at least three open full-time positions that Tobacco had the qualifications for. (App. 455-457; R. Doc. 32-29, p. 759-761; App. 242; R. Doc. 32-8, Elliott Depo at 91; App. 454-457; R. Doc. 32-29, p. 761; App. 459-461, p. 1184, 1190) Within a month after Tobacco was RIF'd, ARI filled all three positions, and both of the newly

18

hired Clinical Coordinators in Rapid City were assigned to work on the SYNCH study. (App. 463-465; R. Doc. 32-31, p. 225)

### Summary of the District Court's decision

The District Court held that Tobacco failed to demonstrate actionable adverse employment action apart from her termination, failed to establish a prima facie level of inference of discrimination, and failed to present sufficient evidence of pretext to survive summary judgment. (App. 523–547; R. Doc. 40) To reach this end, the Court arguably applied a higher level of proof than the minimal showing required by the *McDonnell Douglas* analysis, and its analysis of Tobacco's adverse action proof departed from the controlling standards under *Muldrow v. City of St. Louis*. The Court also made credibility determinations and accepted ARI's version of disputed facts even though Tobacco was the non-moving party. The District Court granted summary judgment on all claims, and dismissed Tobacco's case. (App. 523-547; R. Doc. 40; App. 548, R. Doc. 4) This appeal timely followed. (App. 549-550; R. Doc. 43)

### SUMMARY OF THE ARGUMENTS

Tobacco's appeal presents three central questions: 1) whether the record she presents establishes a variety of adverse employment actions under *Muldrow*; 2) whether her circumstantial evidence combines to permit an inference of race

19

discrimination in her prima facie case; and 3) whether a reasonable jury could find evidence of pretext because ARI's decision-maker admitted that she was instructed to make a 5% budget improvement but that she did not calculate or know the budget impact resulting from her decision to terminate Tobacco for termination in a reduction in force, failed to follow Avera's RIF policies, and had shared with her supervisor that Tobacco was making discrimination complaints in close proximity to the termination decision.

Tobacco first addresses her proof of "some harm" under the *Muldrow v. City of St. Louis* standard only because the underlying summary judgment decision held that she had not met her prima facie showing. It is undisputed that Tobacco has suffered the ultimate adverse impact: she was terminated. Yet she also offered evidence of lesser harm, such as being undermined in her supervisory role.

Second, Tobacco's evidentiary record offers a variety of proof from recognized categories of circumstantial evidence, which together, support a reasonable inference of discrimination sufficient to meet the fourth element of her prima facie case. This evidence includes: (1) comparator evidence; (2) ARI managers marked and sometimes unexplainable departures from Avera's discrimination-reporting and RIF policies; (3) managerial tolerance and even encouragement of insubordination by non-Native staff directed at Tobacco; and (4) racial tokenism.

Appellate Case: 25-2881    Page: 28    Date Filed: 12/02/2025 Entry ID: 5583425

Finally, Tobacco has produced substantial evidence to suggest that ARI's stated budget-based justification is not the real reason that she was terminated, and that her race was a factor in her termination. In addition to the evidence offered in her prima facie case, Tobacco submits undisputed testimony from the decision-maker that there was no budget analysis involved in selecting Tobacco for a budget-based RIF, and that she failed to follow Avera's RIF procedures despite an HR directive. There is undisputed evidence that the decision-maker knew about, and had talked with her supervisor about Tobacco's discrimination and retaliation complaints within the same month that the decision-maker selected Tobacco for termination in a RIF. Further, post-termination evidence demonstrates that ARI was hiring staff, including into SYNCH-related roles in ARI's Rapid City office, within a month after Tobacco's termination.

## ARGUMENTS AND AUTHORITIES

### A.   The Standard of Review

This Court reviews de novo a grant of summary judgment. *Torgerson v. City of Rochester,* 643 F. 3d 1031, 1042 ( 8th Cir. 2011).

### B.   The Summary Judgment Standard

Summary judgment is proper when there is no genuine dispute regarding a material fact and the moving party is entitled to judgment as a

21

matter of law." Fed. R. Civ. P. 56(a). No genuine issue of fact exists where the evidence is such that a reasonable trier of fact could not find otherwise. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Torgerson,* 3 F.3d at 42 (citation omitted).

As she is the non-moving party at this stage of the litigation, the Court must view the evidence in a light most favorable to Tobacco, and must draw all reasonable inferences from that evidence in her favor. *Smith v. URS Corp.,* 803 F.3d 964, 968 (8th Cir. 2015). Tobacco does not have to prove her case at summary judgment, but she must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587.

**C.   Evaluating disparate treatment claims at the summary judgment stage**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination occurs when a protected characteristic is "a motivating factor for any employment practice, even though other factors also motivated the practice. *Id.*

22

The statutory use of "terms" and "conditions" in Title VII is not used in a narrow sense, and covers more than economic or tangible affects. *Muldrow v. City of St. Louis,* 601 U.S. 346, 402 (2024) *quoting Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78 (1998), and *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).  "The words 'discriminate against' … refer to 'difference in treatment that injure' employees….  Or otherwise said, the statute targets practices that "treat[] a person worse because of … [a] protected trait."  *Muldrow,* 601 U.S. at 402, *quoting Bostock v. Clayton County*, 590 U.S. 644, 658, 681 (2020).

The viability of Tobacco's claims are analyzed under the traditional *McDonnell Douglas* framework for evaluating disparate treatment claims that rest upon circumstantial evidence.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  At the first step of that framework, the plaintiff must make a prima facie showing that the employer acted with discriminatory motive:  this is not an onerous burden.  *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  It is intended to be a flexible rather than a rigid, mechanized, or ritualistic standard. *Swierkiewicz v. Sorema N.E.,* 534 U.S. 506, 512 (2002).

To  establish her prima facie case, Tobacco has to show:  1) she is a member of a protected class;  2) she was qualified for her position;  3) she suffered an adverse employment action, which is now defined as "some harm respecting an

23

Appellate Case: 25-2881     Page: 31     Date Filed: 12/02/2025 Entry ID: 5583425

identifiable term or condition of employment"; and 4) circumstances permit an inference of discrimination. *See Muldrow*, 601 U.S. at 354-55; *Lewis v. Heartland Ins of America, LLC*, 591 F.3d 1033, 1038 (8th Cir. 201)(citation omitted). The parties agree that Tobacco has established the first to elements of her prima facie case.

Once a plaintiff has made her prima facie showing of disparate treatment, the burden shifts to the employer to articulate "a legitimate, nondiscriminatory reason for its adverse employment action." *Lewis*, 591 F.3d at 1038 (citation omitted) If the employer articulates such a reason, the burden returns to the employee to prove that the proffered reason is pretextual." *Id.* The employee may establish pretext either by "persuading the court that a discriminatory reason more likely motivated the employer" or by "showing that the employer's proffered explanation is unworthy of credence." *McDonnell Douglas*, 411 U.S. at 802-04.

**ISSUE ONE: Applying the standard established in *Muldrow v. City of St. Louis,* Tobacco has offered sufficient evidence that she suffered some harm due to the terms and conditions of her employment as well as her termination.**

Termination is unquestionably an adverse action, but the United States Supreme Court has made it clear that Title VII was written to protect against a broader range of harms. In *Muldrow v. City of St. Louis*, 601 U.S. at 351-52, the United States Supreme Court clarified that the prima facie showing for an adverse

employment action is met by "showing some harm respecting an identifiable term or condition of employment."  This is a substantial change from the heightened proof of "material employment disadvantage" that was necessary to meet this element under the Eighth Circuit's former standard

Applying *Muldrow*, Tobacco's termination satisfies the adverse-action element independent of her termination.  But the harms Tobacco experienced before her termination independently satisfy the adverse-action element, and provide critical context for assessing discriminatory motive in her case as well.  The record contains multiple instances of harm affecting her access to managerial information, reducing her supervisory authority, and draining her ability to perform essential functions of her primary job duties.  For example, Tobacco can demonstrate that she was excluded from  management meetings, had reduced participation in decision-making, and experienced a loss of access to essential information.  These are harms that constitute adverse action because they diminish the quality and scope of an employee's work.  *Muldrow*, 601 U.S. at 352–55.

Tobacco can show that she held the same job as Andrew and Friedrich—Clinical Research Manager—yet she was excluded from management-level meetings and business planning discussions.  Andrew and Friedrich, both non-Natives, were included, and attended a critical June 6, 2022 managerial meeting where Elliott explained that ARI needed to implement a five-percent budget

Appellate Case: 25-2881     Page: 33     Date Filed: 12/02/2025 Entry ID: 5583425

improvement. Tobacco's supervisor was supposed to tell Tobacco about ARI business, Angal failed to mention any budget changes to Tobacco.

A loss of supervisory power, erosion of authority, and reassignment of decision-making responsibilities are also harms that can be classified as an adverse action pursuant to the *Muldrow* holding. Though Tobacco was formally designated the "sole SYNCH project lead," yet for months and months, ARI allowed non-Native Rapid City staff to disregard and even openly push back at her directives. Andrew and Hockett even secretly intervened on the staff's behalf, apparently adopting a stereotyped assumption that door-to-door recruitment of Native American study participants was dangerous for non-Native staff. While this does not exhaust Tobacco's evidence of workplace harm caused by disparate treatment, it surely and firmly establishes that she has evidence of several adverse employment actions sufficient to meet her prima facie showing.

**ISSUE TWO:  Tobacco has presented sufficient circumstantial evidence to permit a reasonable inference of race discrimination, and has accomplished her prima facie showing.**

At the prima facie stage, a Title VII plaintiff need only present evidence that permits an inference of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802.  This burden is "not onerous." *Burdine*, 450 U.S. at  253. When her the evidence is taken together, Tobacco can meet the minimal prima facie burden, with comparator evidence, policy deviation evidence,  evidence of stereotyped racial

Appellate Case: 25-2881     Page: 34     Date Filed: 12/02/2025 Entry ID: 5583425

remarks in the workplace, and racial tokenism evidence that support a strong inference that her race played a role in the conditions of employment that ARI subjected her to, in the decision to eliminate her position, and in the decision maker's refusal to provide Tobacco with post-RIF job transfer or rehire services despite open jobs that Tobacco was qualified for.

Comparator evidence is a well-recognized means of supporting an inference of discrimination. *Ebersole v. Novo Nordisk, Inc.,* 758 F.3d 917, 925 (8th Cir. 2014). Tobacco, Friedrich, and Andrew each managed an ARI research site, they each had the same job description, and they were all overseen by Elliott. Andrew and Tobacco had even been co-project leaders on the SYNCH team under Deutsch's direction at one point. Thus these employees qualify as comparators, just as Palko and Medler qualify as comparators for Paul Forney.

Andrew and Friedrich experienced materially preferrable treatment in their job roles, authority, networking, and access to information. Andrew and Friedrich had a great advantage when they were included in administrative management-level meetings where critical operational information was shared, including the June 2022 directive requiring ARI had to produce "5% budget improvement" in its budget. Excluded from these meetings -- and excluded from even a summary of them by her supervisor -- Tobacco had no opportunity to pitch ideas or suggest alternative budget adjustments in advance of Elliott's decision to fire her.

27

ARI also differently reinforced Andrew's and Friedrich's supervisory authority, by allowing them to exercise authority over how Tobacco completed her SYNCH study duties and how she managed that staff.  Most telling is that Andrew secretly but actively undermined Tobacco's role as a staff supervisor:  instead of supporting her, Andrew – with Hockett's support – was permitted diminish Tobacco's standing and slow up the SYNCH study as she took up for Palko and Medler when they refused conduct door-to-door Native American recruitment out of fear of being shot or stabbed.  If  there had been a legitimate purpose for how she and Andrew engineered a SYNCH "pause" for Palko and Medler without telling Tobacco about it, it is hard to imagine why Andrew,  Hockett, Angel, Deutsch, or Fredrick did not just tell Tobacco about their role in her struggle to manage the two SYNCH team members.  Andrew even back-channeled about SYNCH recruitment with Deutsch without involving Tobacco, effecting seizing some of Tobacco's most important responsibilities.  The stark differential treatment between the support and authority Andrew was allowed to exercise, versus  how Tobacco was undermined, should individually create an inference that race played a role in Tobacco's work conditions at the summary judgment stage.

It is equally well-established that "an employer's failure to follow its own policies may support an inference of pretext." *Lake v. Yellow Transp., Inc*, 596 F.3d 871, 875 (8th Cir. 2010);  *cf. Morris v. Dept of Veterans Affairs,* 119 F.4[th] 536

Appellate Case: 25-2881     Page: 36     Date Filed: 12/02/2025 Entry ID: 5583425

(8th Cir. 2024) (procedural anomalies that have not impact on the employee's outcome cannot be used as pretext evidence). Such deviations are equally relevant at the prima facie stage because they suggest an employer's decisions were not made in an evenhanded manner.

Tobacco offers multiple, material deviation by ARI managers in contract with Avera's written policies. In a discrimination case involving a number of discrimination complaints by its only Native American manager, ARI managers repeated and intentional failure to follow Avera's discrimination reporting and investigation policies should weigh in Tobacco's favor. Tobacco's word choice -- "discrimination," "tokenization," and "racism" – was not subtle or obscure, and even Palko and Medler knew that her expression of being tokenized was an HR matter. Frederickson made notes for her file, wrote emails with other supervisors about Tobacco's complaints, but she refused to address them as discrimination complaints. The ignored policies directly address how to remedy race discrimination in the Avera workplace.

These was no legitimate business reason for ARI's non-Native managers and its HR officer to repeatedly table or recast Tobacco's discrimination. If Frederick had investigated Tobacco's discrimination complaint, it is reasonable to conclude that she would have immediately found out that Andrew and Hockett were actively supporting Palko and Medler as they refused to follow Tobacco's directives and

29

perform their SYNCH recruitment assignment. The fact that their conduct continued for months suggests that she either did not bother to contact them, or she did not care. This selective disregard for an important Avera policy supports an inference that impermissible motives played a role.

Similarly, even though she had been told to use the RIF policy to have a reduction in force, Elliott did not follow Avera's RIF policies -- which required a budget analysis, objective selection criteria, solicitation of volunteers, reassignment review, and transition services for qualified employees. Her failure to conduct a budget analysis per the RIF policy is perhaps the most telling, because the RIF directive she was using as her excuse was explicitly budget based. Avera suggests that all Elliott had to do was cut out some salary to meet her boss' directive, but her own notes document that a " 5% " budget adjustment was required. Elliott did not do the math at the time, and even during this case, she did not know whether Tobacco's termination met the 5% quota or not. At summary judgment, it is Tobacco, not ARI, who is entitled to rely upon the fact that Elliott's boss identified a specific percentage.

Courts also routinely consider workplace context, racial dynamics and identity-based assumptions when evaluating circumstantial evidence of discrimination. *Reeves v. Sanderson Plumbing Prod, Inc.* 530 U.S. 530, 147–48 (2000); *Lewis,* 591 F.3d at 1041–42. ARI had a racialized environment:

30

- Racism was discussed enough to be referred to by code, as "the elephant in the room"
- Deutsch and Palko each acknowledged talking about how their Native American study  participants could be tokenized or subject to racism in their community

- Even though they lived in Rapid City, non-Native American staff refused to perform door-to-door recruitment to recruit  Native American study participants  because of fear of being shot or stabbed
- Rather than challenging Palko and Medler about their assumptions about being in neighborhoods where they could recruit, Edward and Hocket affirmed their fears and accused Tobacco of being uncaring
- ARI supported for Forney and Tobacco to go door to door in Rapid City, and the only identifiable difference is that Forney and Tobacco are Native American and Palko and Medler are not.
- Forney and Tobacco both openly expressed that their job roles at ARI was a publicity stunt since the conditions of their work was so much less flexible than their ARI non-Native counterparts.
- When she heard that Tobacco was terminated, Deutsch worried about her ability to get future studies in Pine Ridge, even though Tobacco was assigned and also worked on at least one study in Rapid City under Deutsch's directive.

Finally, Tobacco suggests that this Court should expressly recognize and define racial tokenism as valid form of circumstantial evidence supporting discriminatory motive.  Tobacco's definition of racial tokenism is that ARI was engaged in a "practice of making only a perfunctory or symbolic effort to a particular thing, especially by recruiting a small number of people from

31

Appellate Case: 25-2881     Page: 39     Date Filed: 12/02/2025 Entry ID: 5583425

underrepresented groups in order to give the appearance of racial equality within a workforce."[4]  (App. 81-114; R. Doc. 30, p. 15, n.4)

This record reflects precisely the conduct that both Forney and Tobacco complained of experiencing at ARI.  ARI relied  upon Tobacco's Native American identity and her longstanding ties within the Oglala Sioux Tribe to garner support for ARI's research projects – but it also sent her and Forney out to recruit Native American participants in a setting it designated as "dangerous" when it came to its Non-Native American SYNCH staffers.  Forney also claimed that ARI's work assignments made him feel like a token Indian, as the internal assignments that ARI gave Forney were neither protective or considerate: namely, by requiring him to drive to Rapid City to do work in conditions that ARI managers protected Palko and Medler from performing.  For Tobacco, her managerial title and project lead role often belied her daily experience:  Angal had summarily reassigned Forney to Rapid City without consulting her; she was not included in ARI administrative meetings; Angal did not bother sharing critical budget information with her; Andrew and Hockett were permitted to undermine her supervisory authority over

---

[4]  Merriam-Webster Dictionary also identifies tokenism as a gesture superficially focused upon protected category status:  "the policy or practice of making only a symbolic effort (as to desegregate)."  *"Tokenism", Merriam-Webster.com Dictionary, n.d,  www. Meriam-webster/dictionary/tokenism. Accessed November 13, November 2025.*

32

Appellate Case: 25-2881     Page: 40     Date Filed: 12/02/2025 Entry ID: 5583425

her staff, and thereby impede her project progress; and Deutsch and Andrew also teamed up behind her back to design a new recruitment protocol for the SYNCH study, and then assigned the SYNCH team to follow it despite Tobacco's illusory title as the SYNCH team lead.

In *Lewis v. Heartland Inns of America, LLC,* 591 F. 3d at 1039-1041, the Eighth Circuit recognized that a plaintiff may rely on evidence of sex stereotyping to satisfy the inference of discrimination element of a prima facie case, and it can also be relevant at the pretext stage. The Court's analysis in *Lewis* continues to be instructive to Title VII parties because of its clarity about the type or pattern of conduct or commentary that can be used to create an inference of discrimination. Recognition or even acknowledgement of racial tokenism as its own category of circumstantial evidence in Title VII cases will neither expand or limit Title VII protections: but it will instead help lawyers and Courts more easily identify a pattern of conduct that can serve as proof of discriminatory motive. Tobacco therefore urges the Court to explicitly identify racial tokenism in the same way that it previously identified stereotyping based upon protected status as a means to establish discriminatory motive or reveal evidence of pretext.

**ISSUE THREE: Tobacco has many evidentiary paths to raise a genuine issues of material fact as to pretext.**

33

Appellate Case: 25-2881     Page: 41     Date Filed: 12/02/2025 Entry ID: 5583425

At step three of the *McDonnell Douglas* analysis, the burden returns to Tobacco produce evidence of pretext. Proof of pretext amounts to "showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." *Torgerson,* 643 F.3d at 1047. At the pretext stage, the plaintiff will seek to demonstrate that the employer's stated reasons are false, inconsistent, unworthy of credence, or that discrimination was more likely than not the real motive. *Reeves*, 530 U.S. at 147.

Demonstrating that an employer's reasons are "unworthy of credence" serves to support a finding of discrimination because "a trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Ridout v. JBS USA, LLC,* 716 F.3d 1079, 1087 (8th Cir. 2013). While the same evidence can be used to establish both the prima facie case and to show pretext, but the prima facie case identifies conduct that suggests discrimination, while the pretext phase discredits the employer's explanation. Though the burden is on the plaintiff to provide evidence of pretext, to survive summary judgment she need not definitively prove that her employer's reason for firing her was pretextual: instead she must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive. *Anderson v. KAR Global,* 7 F.4th 1031, 1038 (8th Cir. 2023).

Appellate Case: 25-2881     Page: 42     Date Filed: 12/02/2025 Entry ID: 5583425

"As matter of both common sense and federal law, an employer's submission of a discredited explanation for firing a member of a protected class is itself evidence which may persuade the finder of fact that such unlawful discrimination actually occurred." *MacDissi v. Valmont Indus., Inc.,* 856 F.2d 1054, 1059 (8th Cir. 1988). At the same time, Title VII has not "vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgment made by employers." *Regel v. K-Mart Corp.,* 190 F.3d 876, 880 (8th Cir. 1999). Thus it is not necessary for Avera to prove that it was in financial distress or had to make each of its department make a 5% budget adjustment, and Tobacco agrees that a reduction in force for budget reasons can qualify as a legitimate, non-discriminatory reason for a termination. "Even within the context of a legitimate reduction in force, an employer may not fire an employee because" of the employee's race or other protected class. *Yates v. Rexton, Inc.,* 267 F.3d 793, 800 (8th Cir. 2001).

Title VII plaintiffs can prove pretext in a variety of ways, including by demonstrating that the employer was more likely than not motivated by a discriminatory reason, or by demonstrating that the employer's proffered explanation is unworthy of belief. *Pye v. Nu Aire, Inc.,641* F.3d 1011, 1021 (8th Cir. 2011). Evidence of pretext may include inconsistencies, contradictions, deviations from policy, disparate treatment, shifting explanations, and temporal

35

proximity. *Reeves,* 530 U.S. at 147–48. Evidence of how an employer treats similarly situated employees, or how it staffs positions after a termination, can also be relevant circumstantial evidence of pretext. *Lake,* 596 F.3d at 874–75.

An employer's failure to follow its own policies is a recognized way to establish pretext. *Lake,* 596 F.3d at 875. Yet another way to prove pretext in a RIF case is to offer proof that the employee was not, in fact, terminated as part of a true reduction in force. For example, in *Hillebrand v. M-Tron Industries, Inc.,* 827 F.2d 363, 368 (8th Cir. 1987), an employer's plans for a personnel build-up combined with scant evidence of an objective plan to reduce expenses at the time of challenged termination to create a question of fact about the existence of a genuine reduction in force.

Many of the same facts that infer a discriminatory motive in this case can also be used to establish Tobacco's pretext proof. Tobacco presents a robust selection of cumulative evidence from which a reasonable jury could conclude that ARI's stated budget-based justification for the reduction in force was not worthy of credence.

Her primary proof in this regard that Avera issued a directive requiring a specific percentage of budget improvement from each of its departments. She could have found a way to make 5% more income, she could have left open

Appellate Case: 25-2881    Page: 44    Date Filed: 12/02/2025 Entry ID: 5583425

positions unfilled, or she could use the Avera RIF process.  Elliott chose to reach her budget obligation via a RIF, and notably Tobacco was the only employee she chose to RIF.

The fact that Elliott admittedly did not conduct any budget analysis when she selected Tobacco, and that she did not every calculate whether Tobacco's termination met the 5% quota or not, is strong evidence of pretext.   It was Elliott who announced that ARI needed to make a 5% budget improvement.  Moreover, Avera's RIF policy requires a specific budget calculation in the RIF selection process.  A reasonably jury could agree that it is a sham to claim that  Tobacco's termination as part of an Avera budget-based RIF selection when there wasn't any budget consideration attempted.

Elliott sought to schedule Tobacco's termination as soon as possible.  This was not necessary for business reasons, and it is also evidence of the extent of Tobacco's isolation at ARI that Tobacco's first knowledge about any required budget trimming was during her termination call.  Even the fact that she was terminated effective immediately raises suspicion because of the way it clashes with the RIF policies.

At some point,  Frederick and Elliott did get together and reviewed the RIF policy about Tobacco's option to receive Avera's employment services so she

37

Appellate Case: 25-2881     Page: 45     Date Filed: 12/02/2025 Entry ID: 5583425

could try to find a job at Avera. Since Frederick and Elliott knew of several open ARI positions in Rapid City that Tobacco could qualify, their contrived explanation for why Tobacco was not offered Avera's post-RIF employment service has a good chance of being classified as phony by a fact finder.

Elliott and Frederick have not been able to claim that Tobacco was disqualified from the reemployment services program. They came up with several Avera rules that would have stymied Tobacco in transferring to different Avera position – none of which are actually rules. Their willingness to ignore actual policies and create imaginary ones had the same purpose: they wanted Tobacco out of Avera all together.

Perhaps Elliott's most incredible excuse for not providing Tobacco with Avera job transition services, though, was that Tobacco "would not have gotten severance if we had offered one of these open positions to her." (Elliott Depo at 91) The difference between a possible new job or at least two months of financially supported time in her position so that Tobacco could locate another job and benefits versus a one-time severance check after a termination seems substantial, but Elliott and Frederick are determined to portray their severance plan as a dream come true for Tobacco. However, Elliott was unable to explain why she decided that what was best for Tobacco was to severance check instead

38

Appellate Case: 25-2881     Page: 46     Date Filed: 12/02/2025 Entry ID: 5583425

keeping an Avera job with ongoing wages and benefits.

Further evidence of pretext is that Elliott has admitted that she knew about Tobacco's June 2022 discrimination and retaliation complaints – and that she told her boss about them. There is not a legitimate reason why Elliott and her supervisor would have been talking about Tobacco's discrimination complaint—as it was not being actively investigated. The fact that this conversation took place so close in time to Elliott's decision to terminate Tobacco is a fact that has to be viewed in Tobacco's favor at this point.

In many ways at the center of this case remains Tobacco's question about why ARI supervisors thought it was safe for Tobacco and Forney to go out and recruit Native American study participants door-to-door, but too dangerous for Palko and Medley. Perhaps a jury will conclude that Tobacco's racism concerns were unfounded, but it is also possible that a jury could find that ARI managers were tokenizing Tobacco and Forney to build their grant opportunities. Because the facts do not dictate one obvious outcome in this case, a jury should answer them.

## **CONCLUSION**

Based upon the foregoing arguments, Plaintiff-Appellant Deborah Tobacco requests that the Court reverse the District Court's Order of Dismissal and remand

39

Appellate Case: 25-2881     Page: 47     Date Filed: 12/02/2025 Entry ID: 5583425

this case to the District Court for trial of Tobacco's Title VII race discrimination claims.

Dated this 1st day of December, 2025.

/S Stephanie E. Pochop
Stephanie E. Pochop
JOHNSON POCHOP & BARTLING
LAW OFFICE, LLP
405 Main Street
Gregory, SD  57533
(605) 835-8391
Stephanie@Rosebudlawyers.com
*Attorney for Plaintiff-Appellant*
*Deborah Tobacco*

Appellate Case: 25-2881     Page: 48     Date Filed: 12/02/2025 Entry ID: 5583425

# CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2025, I electronically submitted the foregoing Appellant's Brief for Review with the Clerk of the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated this 1st day of December, 2025.

\_\_/S Stephanie E. Pochop_____
Stephanie E. Pochop
*Attorney for Plaintiff-Appellant*
*Deborah Tobacco*

41

Appellate Case: 25-2881    Page: 49    Date Filed: 12/02/2025 Entry ID: 5583425

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7(B) because, excluding the parties of the document exempted by Fed. R. App. P. 32(f), this document contains 8,990 words and 804 lines.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)  because this document has been prepared in a proportionally spaced typeface using Microsoft Office 365 Word in 14-point Times New Roman font.

Pursuant to Eighth Circuit Local Rule 28A(b)(2), this brief has been scanned for viruses and is virus-free.

Dated this 1st day of December, 2025.

_/S Stephanie E. Pochop_____
Stephanie E. Pochop
*Attorney for Plaintiff-Appellant Deborah Tobacco*

Appellate Case: 25-2881    Page: 50    Date Filed: 12/02/2025 Entry ID: 5583425