Appeal No.  25-2881

# IN THE UNITED STATES COURT OF

# APPEALS FOR THE EIGHTH CIRCUIT

**DEBORAH TOBACCO,**

**Plaintiff-Appellant,**

**V.**

**AVERA MCKENNAN D/B/A AVERA RESEARCH INSTITUTE,**

**Defendant-Appellee.**

*On Appeal from the United States District
Court for the District of South Dakota,
Western Division Case No. 5:23-cv-
05032-CCT
The Honorable Camela Theeler, Judge*

## REPLY BRIEF
## OF APPELLANT DEBORAH TOBACCO

*Submitted by:*   Stephanie E. Pochop
JOHNSON POCHOP & BARTLING LAW
OFFICE, LLP
405 Main Street
Gregory, SD  57533
(605) 835-8391
*Attorneys for Appellant*

# TABLE OF CONTENTS

                                                                    **Page**

**TABLE OF CONTENTS** ........................................................................**ii**

**TABLE OF AUTHORITIES** ..................................................................**iii**

**REBUTTAL  ARGUMENTS**....................................................................**1**

  **ISSUE I:   TOBACCO PRESENTS A TRIABLE CLAIM OF
DISCRIMINATORY TERMINATION……………………..  1**

  **ISSUE II:  AVERA'S ASSERTED RIF JUSTIFICATION DOES
NOT DEFEAT THE TERMINATION CLAIM AND
PRESENTS  A  JURY  QUESTION ON PRETEXT………. 6**

  **ISSUE III: DISPARATE TREATMENT PRIOR TO
TERMINATION PROVIDES CIRCUMSTANTIAL
EVIDENCE OF PRETEXT……………………… ...........12**

  **A.  Exclusion From Meetings and Decisionmaking
Undermines Avera's Explanation………………………………12**

  **B.  Uneven Application of Safety Concerns Supports an
Inference of Pretext…………………………………………………14**

  **C.  Cumulative Consideration of Disparate Treatment
Undermines Avera's Fragmented Analysis
Supports Jury Consideration.........................................................16**

  **ISSUE  IV  TOKENIZATION, IGNORED
DISCRIMINATION COMPLAINTS, AND
PROCEDURAL IRREGULARITIES FURTHER
UNDERMINE THE CREDIBILITY OF
AVERA'S EXPLANATION .................................................... ..18**

  **A. Tokenization Provides Context for Understanding
How Discriminatory Motive May Manifest……………………18**

Appellate Case: 25-2881     Page: 2     Date Filed: 02/24/2026 Entry ID: 5611555

**B. Avera's Handling of Tobacco's Complaints Further Undermines Avera's Credibility………………………………20**

**CONCLUSION……………………………………………….23**

**CERTIFICATE OF SERVICE…………………………………..25**

**CERTIFICATE OF COMPLIANCE…………………………..26**

Appellate Case: 25-2881   Page: 3   Date Filed: 02/24/2026 Entry ID: 5611555

# **TABLE OF AUTHORITIES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242(1986)…….………………….. 1

*Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917 (8th Cir. 2014)……………... 15

*Lake v. Yellow Transp., Inc.*, 596 F.3d 871 (8th Cir. 2010)……….2,6,15,17, 21

*Lewis v. Heartland Inns of Am., L.L.C.*,
591 F.3d 1033 (8th Cir. 2010)……….……………………… 2,13,15,19, 20

*Muldrow v. City of St. Louis,* 601 U.S. 346 (2024)………….……………….13

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133(2000)………….……………………….. 6,11,13,16,17,18, 23

*Ridout v. JBS USA, LLC*, 716 F.3d 1079 (8th Cir. 2013)…….…………….2

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)………… …….1

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)
(en banc)………….…………………………………………….6,14,16,17,22

*Young v. Builders Steel Co.*, 754 F.3d 573 (8th Cir. 2014)…….…………….2

Appellate Case: 25-2881   Page: 4   Date Filed: 02/24/2026 Entry ID: 5611555

<u>**REBUTTAL ARGUMENTS**</u>

**ISSUE I: TOBACCO PRESENTS PROOF TO SUPPORT A PRIMA FACIE CLAIM OF DISCRIMINATORY TERMINATION.**

Tobacco's claims involve both allegations that her race was a factor in the disparate treatment she experienced as compared to similarly situated non-Native American employees and in her discriminatory termination. For a de novo review, the question is whether the facts that she had produced, viewed as a whole, would permit a reasonable jury to conclude that her termination occurred under circumstances giving rise to an inference of discrimination. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As set forth in her original brief and clarified here, they do.

Avera's principal argument is that Tobacco cannot meet the fourth prong of the *McDonnell Douglas* framework, and its argument rests on the mistaken premise that Tobacco was required, at the prima facie stage, to produce evidence that race was the determining factor in her termination. (Appellee's Brief, pp. 15, 31-32) ("Tobacco has no evidence that her race was a factor in her termination.") This argument conflates Tobacco's prima facie threshold with the pretext inquiry: to meet her prima facie showing of discriminatory termination or disparate treatment, Tobacco need only produce some evidence that the circumstances surrounding the adverse actions, if believed, would permit an inference of

1

discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973);

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)

Avera argues that Tobacco's comparator evidence is fatally flawed. (Appellee's Brief, pp. 15-21) Relying upon the District Court's summary judgment finding, Avera claims that Tobacco waived the comparator issue by failing to raise it at the District Court level. (Appellee's Brief, p. 16; Addendum, p. 26) However, Tobacco repeatedly asserted and developed comparator evidence, from her Complaint and in her Statement of Material Facts. (App. 4, 6, 8, 9, 12: R. Doc. 1, ¶¶ 23, 41, 54, 55, 75; App. 90, 92, 98, 99-100, 101: R. Doc. 30, ¶¶ 33, 34, 35, 43, 44, 45, 67, 70, 77, 84)

Comparator evidence can do double duty, and may satisfy both the prima facie and pretext stages of the analysis. *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874–75 (8th Cir. 2010); *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1040–41 (8th Cir. 2010) In termination cases, a plaintiff may establish an inference of discrimination by showing that similarly situated employees outside the protected class were treated more favorably. *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013); *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014) A clone is not required, and employees must instead be similar in "all relevant respects," which generally includes having the same supervisor, being subject to the same standards, and performing comparable job duties. *Ridout*, 716

2

F.3d at 1085.

Avera argues that there are no proper comparator employees in this case. (Appellee's Brief, p. 16) It asserts that Andrew and Friedrich are not proper comparators because they had more research assignments, supervised more employees, and managed more grant funding than Tobacco. (Appellee's Brief, p. 17) But Avera raises differences related to the quantity of work assigned—not to differences in job title, qualifications, supervisor, or core job duties, and ARI's organizational chart confirms that the three Clinical Research Managers shared the same title, administrative level, pool of research scientists, and shared Elliott as their ultimate decision-maker. (App. 456: R. Doc. 32-29)

In fact, Avera's own Statement of Material Facts describes Tobacco as holding "one of three similar manager positions." (App. 23: R. Doc. 21, ¶ 6) Deutsch also testified that she told Tobacco that Deutsch removed Andrew from Andrew's co-lead role in the SYNCH study and designated Tobacco in her place as the SYNCH project manager because Andrew did not know what the project needed. (App. 207: R. Doc. 32-4, Deutsch Depo at 27) After Elliott terminated Tobacco, Andrew took over Tobacco's supervision of Forney, and was reassigned as the SYNCH project manager. (App. 209: R. Doc. 32-4, Deutsch Depo at 34; App. 36: R. Doc. 21-1, Hockett Depo at 100) Because Andrew and Tobacco shared the same job title, recruitment responsibilities, supervisor, and supervisory

3

authority within the SYNCH study, Andrew is an appropriate comparator under the "all relevant respects" standard. *Young*, 754 F.3d at 578-79.

Andrew and Friedrich were not only retained and assigned to Tobacco's job duties after Tobacco was RIF'd: before that, for at least a year, Andrew and Friedrich had been included in ARI administrative meetings with Elliott and other supervisors that Tobacco was excluded from. (Appellee's Brief, p. 18) Further, even though Andrew had been removed from the SYNCH co-project lead and Deutsch had authorized Tobacco to assign SYNCH team members to door-to-door recruitment, Andrew was allowed to interfere with Palko's and Medler's SYNCH duties and thwart Tobacco's work assignments, as she and Hockett arranged to give Palko and Medler a "pause" from SYNCH duties. (App. 38: R. Doc. 22-1, Hockett Depo at 109)

This triggered ongoing complaints from Tobacco about the unfair distribution of SYNCH work upon her and Forney because Palko and Medler *never* went door-to-door when under Tobacco's directive to do so (App. 212, 213: R. Doc. 32-4, Deutsch Depo at 66, 69; App. 177: R. Doc. 32-1, Tobacco Depo at 15; App. 425: R. Doc. 32-18) Notably, Palko had previously gone door-to-door to recruit for SYNCH, so Tobacco's directive was not new to him, and Deutsch had approved Tobacco's door-to-door recruitment strategy as a "good idea." (App. 200: R. Doc. 32-3, Palko Depo at 36; App. 209: R. Doc. 32-4,

4

Deutsch Depo at 36)   Assuming their concerns about Palko and Medler being shot, stabbed or subjected to violence during door-to-door recruitment, Andrew and Hockett thus also kept Palko and Medler "safer" than Tobacco and Forney who continued to do door-to-door recruitment.  (App. 165-166:  R. Doc. 32-1, Tobacco Depo at 99-100)

Yet Deutsch allowed Andrew to come to her with "a solution" to Palko's and Medler's refusal to follow Tobacco's recruitment directives, effectively permitting Andrew to weigh in on the most effective way to recruit in Rapid City for the SYNCH team. (App. 212:  R. Doc. 32-4, Deutsch Depo at 66)  The issue is not whether Deutsch had the ability or authority to change her mind:  it is that Deutsch allowed Andrew to exercise veto authority over Tobacco in Tobacco's leadership role, even though Deutsch had recently removed Andrew from SYNCH for not knowing what the project needed. (App. 207:  R. Doc. 32-4, Deutsch Depo at 27)

Avera's next argument is that its C.E.O.'s directive caused a RIF "resulting in the termination of hundreds of employees, 95% of whom were Caucasian." (Appellee's Brief, p. 7)  However, it also claims that there were "no set criteria for the directive." (Appellee's Brief, p. 21)  Its two positions – especially when compared to Avera's written and detailed RIF policy and RIF toolkit checklists -- create a material issue of fact about whether all employees involved in the RIF

Appellate Case: 25-2881     Page: 9     Date Filed: 02/24/2026 Entry ID: 5611555

were selected the way Tobacco was.  (App. 330, 331, 333, 338-342:  R. Doc. 32-11, p. 6, 7,  14-18)  A reasonable jury could conclude that Tobacco's termination occurred under circumstances giving rise to an inference of discrimination, satisfying Tobacco's minimal prima facie burden and moving the summary judgment analysis forward to the pretext phase.

### ISSUE II:  AVERA'S ASSERTED RIF JUSTIFICATION PRESENTS A JURY QUESTION OF PRETEXT

The next issue is whether Avera's stated non-discriminatory justification for Tobacco's termination—a budget-driven 5% reduction in force—defeats the claim as a matter of law.  At the pretext stage, Tobacco's burden is one of production, not persuasion. She must identify evidence from which a reasonable jury could disbelieve Avera's stated reason or conclude that discrimination was a motivating factor in the termination decision. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *Lake*, 596 F.3d at 874–75.  Competing explanations or credibility disputes should be resolved by a jury. *Torgerson v. City of Rochester*, 643 F.3d  1031(8th Cir. 2011)(en banc).

A jury could disbelieve Avera's RIF explanation for four reasons: (1) its reason has shifted from a mandatory reduction to a discretionary budget adjustment;  (2) Elliott  did not attempt to match her decision with the specific financial budget adjustment that the C.E.O. directed;  (3) Elliott  failed to follow Avera's detailed RIF policy despite an HR directive to do so; and (4) ARI

6

continued hiring while it RIF'd Tobacco.

First, Avera has not consistently described the nature of the alleged 5% directive. In its Statement of Material Facts # 10, and in an affidavit from Frederick, Avera has represented that there was "a directive to the leaders of the various departments within Avera McKennan, including [ARI], to reduce their respective budgets by five percent." (App. 23: R. Doc. 21, ¶ 10; App. 79: R. Doc. 23, ¶ 2) Because Elliott's meeting notes and the June 6, 2022 ARI managers' agenda document that department leaders were given options to raise revenue or cut costs however they saw fit, Avera now abandons its mandate claim. (App. 423: R. Doc. 32-17; App. 427: R. Doc. 32-19; Appellee's Brief, p. 7) Because of the marked difference between a broad range of options and a mandatory budget cut, Tobacco is entitled to call this a shifting explanation for her termination.

Second, while its explanation for the RIF decision has changed, the one consistent fact that Avera has stuck with is that Elliott was directed to achieve a fixed, 5% budget reduction. (Appellee's Brief, p. 21) However, Elliott testified that in selecting Tobacco for termination, she did not use a particular number, did not tie her decision to terminate Tobacco's position to any defined savings goal, and did not calculate a specific percentage reduction before selecting Tobacco for RIF elimination. (App. 241, 244: R. Doc. 32-88, Elliott Depo at 90, 102) Avera's RIF process flow chart states that the first step in its RIF process is "Detailed

7

Budget Analysis occurs with targets set." (App. 33: R. Doc. 32-11, p. 9) Frederick also testified that there was an overall expectation that Elliott would have looked at her budget to determine ways to reduce costs. (App. 42: R. Doc. 22-22, Frederick Depo at 23) A 5% budget reduction (or increase) should be at least a roughly articulable sum, which could make Avera's claim that Tobacco was terminated to meet the "5% reduction" directive unworthy of credence.

Third, Elliott testified that she made the decision to terminate Tobacco first, then looked at the Avera RIF policy. (Appellee's Brief, p. 9) This is a material inconsistency with Avera's RIF policy, which Elliott admitted that she needed to abide by. (App. 235: R. Doc. 32-8, Elliott Depo at 59) Frederick testified, too, that Elliott had to follow Avera's RIF policy. (App. 271, 272, 273, 274: R. Doc. 32-5, Frederick Depo at 57, 62, 66, 74).

This is material because Avera's RIF policy emphasizes employee retention, and includes a list of factors to be considered when making a RIF selection (not after doing so), including seniority, past job performance, skill level, and disciplinary action. (App. 233-34: R. Doc. 32-8, Elliott Depo at 57-58; App. 333, 356: R. Doc. 32-11, p. 9, 32) Using those criteria, an experienced and highly performing employee like Tobacco would not have been an obvious target for elimination; more importantly, none of the policy factors were identified as a factor that Elliott used to select Tobacco. (Appellee's Brief, pp. 8-9)

8

Appellate Case: 25-2881     Page: 12     Date Filed: 02/24/2026 Entry ID: 5611555

Another important component of the Avera RIF policy required consideration of Human Resources Transition Services, which would have permitted continued employment during a two-month transition period. (App. 340-41: R. Doc. 32-11, p. 560) The policy identifies only one factor, disciplinary action, that would disqualify an employee from its transition service program, and that factor did not apply to Tobacco, and Elliott herself would not say that the program did not apply to Tobacco. (App. 237: R. Doc. 32-8, Elliott Depo at 65) Instead, Avera has claimed that Elliott "settled on" termination and severance for Tobacco because transition services would have resulted in demotion or a move for Tobacco. (App. 25: R. Doc. 21, ¶ 19)

Avera now claims that Tobacco was told that there were open positions for which she could apply but that Tobacco "simply never reached out to the transition team and sought services." (Appellee's Brief, p. 24) Elliott admits that they did not ask Tobacco if she would be willing to accept a demotion instead of termination. (App. 236: R. Doc. 32-8, Elliott Depo at 61) And Tobacco testified that the only thing she recalls being told during the phone call with Frederick and Elliott, where she was terminated effectively immediately, was that she was being let go because of budget constraints, and Tobacco asked if it was because of her discrimination reports. (App. 150-51: R. Doc. 32-1, Tobacco Depo 50-52; App. 68: R. Doc. 22-3, Elliott Depo at 141)

9

Tobacco's position is circumstantially supported by the fact that Elliott and Frederick's only documentation of the conversation is an email where Elliott is making sure that Tobacco did not take any Avera property with her. (App. 439: R. Doc. 32-24) In fact, Tobacco's post-termination emails indicate that she did not know if she had to accept termination and severance. (App. 447-449: R. Doc. 32-27) Avera responded by telling her that she did not have an option, and it again failed to mention the existence or availability of its transition services program. *Id.*

Fourth, Avera does not dispute that it had multiple open positions – even within ARI -- for which Tobacco was qualified at the time of her termination. (App. 457: R. Doc. 32-29) Elliott claims that these were not "like" positions, (App. 236: R. Doc. 32-8, Elliott Depo at 61), yet she also testified that Tobacco was eligible to apply for a position that would have been a demotion – but apparently only after her termination. (App. 61, 67: R. Doc. 22-3, Elliott Depo at 91, 139) An additional conflict in credibility arises because Avera's HR Transitions Services program openly envisions employees taken lesser paying, part-time positions, even in jobs in other departments, while they job search within Avera to avoid termination in a RIF. (App. 459, 461: R. Doc. 32-30, p. 1, 3; App. 463-64: R. Doc. 32-31, p. 1-4; App. 467: R. Doc. 32-32)

Avera's essentially contemporaneous hiring activity is difficult to reconcile

10

with Elliott's narrative about having no other choice but to eliminate Tobacco in a RIF, and it cannot reasonably explain how getting a severance and immediate termination met with its RIF policy in either spirit or form.

A plaintiff is not required to produce additional independent evidence of animus once the employer's explanation is shown to be contestable, as disbelief of the proffered reason itself permits an inference of discrimination. *Reeves,* 530 U.S. at 147–48. However, Tobacco has offered evidence that Elliott had previously linked Tobacco's ARI opportunities with her race. For example, Tobacco testified that Elliott told her that she could not have a lead position in a Native American-focused study because that would be a conflict of interest. (App. 155-56: R. Doc. 32-1, Tobacco Depo at 65-66) Hockett testified that if this was said, it was not only wrong, it could be evidence of discrimination. (App. 305-306: R. Doc. 32-6, Hockett Depo at 71-72) Tobacco also has adduced evidence that Elliott was aware of her ongoing complaints of unfair work distribution in the workplace over the situation with Andrew, Palko and Medler, and that this complaint was identified as being "for HR files." (App. 425: R. Doc. 32-18)

Viewed in the light most favorable to Tobacco, a reasonable jury could conclude that Avera's asserted RIF justification was not compelled, not consistently described, and not applied in accordance with its own policies or

11

procedures — and therefore could find that Tobacco's race was a motivating factor in the termination decision. Summary judgment on this record is therefore improper.

### ISSUE III: DISPARATE TREATMENT PRIOR TO TERMINATION PROVIDES ADDITIONAL CIRCUMSTANTIAL EVIDENCE OF PRETEXT

Avera's pretext argument isolates the termination decision from the workplace context that preceded it, (Appellee's Brief, pp. 26–31, 41–45), but courts must evaluate the entire evidentiary record when determining whether an employer's explanation is credible. *Reeves*, 530 U.S. at 148–49. Evidence of disparate treatment preceding a termination can be probative where it bears on whether the employer's stated rationale fully explains its conduct. *Id.* at 147.

### A. Exclusion From Administrative Meetings And Decisionmaking Undermines Avera's Neutral Explanation

Avera acknowledges that Tobacco was not included in the monthly administrative meetings attended by Andrew and Friedrich. (Appellee's Brief, p. 43)  It asserts that this exclusion was benign because those meetings concerned the ECHO study, in which Tobacco was not involved.  *Id.* The record permits a different inference.

While Avera claims that Tobacco was excused from attending its administrative meetings sometime in mid-2021,  (Appellee's Brief, p. 43), Tobacco

12

Appellate Case: 25-2881     Page: 16     Date Filed: 02/24/2026 Entry ID: 5611555

disputes that she voluntarily missed these meetings, and instead avers that she did not even know about them.  (App. 148, 149: R. Doc. 32-1, Tobacco Depo at 46, 49)  Notably, in March  2021, Tobacco had complained that Avera's PTO policy was not fair to her as a Lakota person who wanted to celebrate her own culture's religious holidays.   (App. 381-82: R. Doc. 32-13)

Moreover, the June 6, 2022 meeting minutes reflect that the agenda included not only ECHO matters, but also the 5% budget adjustment, other ARI projects, and operational procedures. (App. 427: R. Doc. 32-19)  Thus, the meetings from which Tobacco was excluded addressed resource allocation and budget directives that directly affected her department and ultimately her position. This creates a dispute of fact about whether it was an advantage to Andrew and Friedrich to get to attend.

Different  access to information and the decisionmaking channels is not trivial. Removal from opportunities to work with high-level supervisors on department priorities and lesser authority or less-visible job duties can be evidence of adverse action.  *Muldrow v. City of St. Louis*, 601 U.S. 346, 359 (2024); *see also Lewis,* 591 F.3d at 1033.  A reasonable jury could conclude that exclusion from meetings where managers talked about all ARI projects and budget decisions was a material disadvantage to Tobacco's ability to advocate for her position or her programs,  and left her uninformed about at least one decision that fatally

13

affected her employment.

As set forth above, although Deutsch told Tobacco that Tobacco was the sole SYNCH project lead and responsible for assigning Rapid City staff duties, Palko and Hockett both testified that Andrew continued to exercise influence over staffing decisions and recruitment methodology -- behind the scenes. (App. 193: R. Doc. 32-3, Palko Depo at 26; App. 308: R. Doc. 32-6, Hockett Depo at 109; App. 425: R. Doc. 32-18; App. 429: R. Doc. 32-20)   This evidence bears directly on pretext.  When an employer diminishes an employee's authority and excludes her from decisionmaking processes shortly before eliminating her position through a discretionary RIF,  a jury may question whether the proffered financial explanation fully accounts for the decision. *Lake*, 596 F.3d at 875.  At summary judgment, the Court does not determine whether Avera's explanation about terms and conditions of employment is more persuasive; it determines only whether a reasonable jury could find it incomplete or unworthy of credence. *Torgerson*, 643 F.3d at 1042–43. On this record, it could.

**B.  Uneven Application of Safety Concerns Supports an Inference of  Pretext**

Avera characterizes its handling of door-to-door recruitment as a neutral response to a serious employee safety concerns. (Appellee's Brief, pp. 19–21, 28–31)  Both adjectives, though, are in question based on this record, which permits a different inference. Differential enforcement of job expectations—particularly

14

when it burdens a protected employee while excusing others—may support a finding that the employer's stated rationale was not applied evenhandedly. *Lewis,* 591 F.3d at 1040.

The record reflects that door-to-door recruitment had previously been a successful and accepted component of the SYNCH recruitment effort. (App. 165-66: R. Doc. 32-1, Tobacco Depo at 99-100)  Deutsch told Tobacco she thought it was a good idea. (App. 209: R. Doc.  32-4, Deutsch Depo at 36)  Yet when safety concerns were raised by Palko and Medler, these subordinate employees were permitted to pause in-person recruitment (with Andrew's winking intervention) while Tobacco and Forney continued performing those duties. (App. 171-172: R. Doc. 32-2, Forney Depo at 16, 19-20, 25)  At the same time, Tobacco was actively attempting to enforce performance expectations related to recruitment and to obtain accountability for failure to perform assigned duties. (App. 193: R. Doc. 32-3, Palko Depo at 26; App. 425: R. Doc. 32-18; App. 429: R. Doc. 32-20)

Where an employer enforces expectations unevenly, or invokes justifications inconsistently, that disparity may permit a finding of pretext. *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925  (8th Cir. 2014)  Again, the issue here is not whether the generic but articulated safety concerns could have been genuine; it is whether they were neutrally administered.  If Avera's managers were genuine and correct, their decision to do nothing when it came to Tobacco and

15

Forney exposed them to danger of serious bodily harm. Thus, a jury could infer that Avera's explanation endangered her life as well as diminished her authority.

This evidence is particularly probative when considered alongside the discretionary nature of the subsequent termination decision, which is set forth above. If expectations were not enforced uniformly prior to the RIF, and work conditions were not uniformly enforced, a reasonable jury could question whether the RIF decision itself was neutrally applied. At the pretext stage, the Court does not determine whether Avera's explanation was reasonable, but whether it must be believed as a matter of law. *Reeves,* 530 U.S. at 147; *Torgerson*, 643 F.3d at 1042. On this record, it need not be.

### C. Cumulative Consideration of Disparate Treatment Undermines Avera's Fragmented Analysis

Avera's Brief addresses each category of evidence in isolation—meeting access, SYNCH authority, recruitment methodology, safety concerns—and then argues that none independently establishes discrimination. (Appellee's Brief, pp. 26–31, 41–45) That approach misstates the summary-judgment inquiry. The Supreme Court has made clear that courts must consider the entire evidentiary record when evaluating pretext, not "divide and conquer" individual pieces of circumstantial evidence. *Reeves,* 530 U.S. at 148–49.

Tobacco does not need, at this stage, to prove that her exclusion from

Appellate Case: 25-2881    Page: 20    Date Filed: 02/24/2026 Entry ID: 5611555

meetings alone proves discrimination, or that ARI's uneven enforcement of recruitment duties and employee protections alone establishes liability. Instead, she must show that, when combined with a discretionary termination decision lacking objective criteria and accompanied by shifting explanations, the actions taken to diminish her authority and limited her input, and thus treated her worse than it treated her similarly situated non-Native American co-workers permits a reasonable inference that Avera's stated RIF rationale is not the whole story. *Lake*, 596 F.3d at 875.

Prior to her termination, Tobacco was excluded from administrative forums where budget decisions were discussed, her authority over SYNCH staffing was undermined despite a public-facing designation of her as the project lead, and the job expectations related to in-person recruitment were applied unevenly. When that evidence precedes a contested, discretionary elimination of her position, a jury may reasonably view the termination as part of a broader pattern rather than as an isolated financial decision. *Reeves*, 530 U.S. at 147.

Avera argues that each fact here is benign -- when viewed alone. But at summary judgment, courts do not weigh which inference is more persuasive; they determine only whether a reasonable jury could draw a discriminatory inference from the totality of the circumstances. *Torgerson*, 643 F.3d at 1042–43. Viewed cumulatively, the disparate treatment preceding Tobacco's termination

17

reinforces—not weakens—the conclusion that credibility determinations in this case belong to a jury.

### ISSUE IV: TOKENIZATION, IGNORED DISCRIMINATION COMPLAINTS, AND PROCEDURAL IRREGULARITIES FURTHER UNDERMINE THE CREDIBILITY OF AVERA'S EXPLANATION

Avera treats Tobacco's evidence of tokenization and ignored discrimination and retaliation complaints as immaterial because she did not plead a separate retaliation claim, and because "tokenism" is not an independent cause of action. (Appellee's Brief, pp. 30–33, 41–45) That framing misapprehends the relevance of this evidence. Tobacco does not assert tokenization or retaliation as standalone claims: she offers them in the form of circumstantial evidence bearing on whether Avera's asserted RIF justification is worthy of credence. *Reeves*, 530 U.S. at 147–48. At summary judgment, courts must consider the totality of circumstances surrounding the termination decision, including contextual evidence that illuminates motive. *Id.*

**A. Tokenization and Stereotyping Provide Context for Understanding Discriminatory Motive**

It is at least arguable that Avera used Tobacco's Native American identity as a way to gain Tribal engagement and support for its grant efforts. (App. 225: R. Doc. 32-8, Elliott Depo at 35, 43; App. 208: R. Doc. 32-4, Deutsch Depo at 29) At the same time, her internal authority over staffing and recruitment methodology

18

was undermined by Avera managers and by the staff she was tasked with supervising. (App. 193: R. Doc. 32-3, Palko Depo at 26; App. 308: R. Doc. 32-6, Hockett Depo at 109)  This is the basis of Tobacco's tokenism argument.

The Eighth Circuit has recognized that stereotyping and identity-based assumptions may constitute actionable discrimination and are probative of intent. *Lewis,* 591 F.3d at 1040–42.  Plaintiffs know what type of evidence will be offered in a stereotype case.  She believes that the same should occur when a plaintiff alleges tokenization.

Thus Tobacco does not argue that "tokenization" should be recognized as an independent legal theory. Rather, she submits that it should be defined, and recognized as evidence that she and Forney were valued symbolically for external credibility with the public,  while ARI managers otherwise undermined Tobacco's authority as a manager, and assigned basic but more difficult or dangerous tasks to her.  Tobacco also testified that Elliott told Tobacco that Tobacco could not serve in a lead role on a Native American project because she was Native American and that would create a conflict of interest.

With this additional evidence, a reasonable jury could interpret such a statement as reflecting an assumption that a Native American employee should not occupy a position of substantive leadership over work centered on Native communities. Following *Lewis*, evidence that decisionmakers imposed limitations

19

upon Tobacco's authority and terms of work tied to protected identity—even if framed or phrased publicly to have a neutral tone—may constitute circumstantial proof that race influenced employment decisions. *Lewis*, 591 F.3d at 1040–42.

A jury could reasonably conclude that Tobacco's Native American identity was institutionally advantageous for grant writing and Tribal engagement in grant studies, yet Tobacco's value to Avera internally was curtailed and minimized in a way that her non-Native American managers did not experience. Evidence that she and the only other Native American SYNCH team member perceived themselves as functioning as symbolic representatives rather than empowered co-workers or leaders, is just their opinion – but they did report it to Avera, which did nothing about it. (App. 171-172: R. Doc. 32-2, Forney Depo at 16) When considered alongside a discretionary termination decision, this contrast may inform whether Avera's asserted neutral explanation fully accounts for her selection for elimination.

## B. The Handling and Timing of Tobacco's Complaints Bear on Credibility

Avera also argues that because Tobacco did not plead retaliation, her complaints about discrimination are immaterial. (Appellee's Brief, pp. 41–45). That is incorrect. Evidence of how an employer responds to discrimination complaints may bear directly on whether its subsequent explanations are credible. *Lake*, 596 F.3d at 875.

Appellate Case: 25-2881    Page: 24    Date Filed: 02/24/2026 Entry ID: 5611555

Tobacco expressly characterized the decision to send Forney and her to recruit door-to-door in what Avera managers claim was a dangerous community as "outright racist." (App. 150: R. Doc. 32-1, Tobacco Depo at 50; App. 435: R. Doc. 32-18) A complaint framed in those terms should have triggered a meaningful, immediate investigation into whether race influenced work assignments or safety determinations. Instead, there is no evidence of interviews with identified witnesses, no documented analysis of the assignment decision, and no formal follow-up addressing the substance of the allegation. (App. 434: R. Doc. 32-22) A reasonable jury could conclude that the absence of investigation into a direct allegation of racial bias—particularly where it was communicated within months before the termination decision—bears on whether Avera's later insistence that race played no role is credible.

On June 3 and June 9, 2022, Tobacco again contacted HR to report retaliation, confusion about her job duties, and unfair work distribution on the SYNCH team. (App. 435: R. Doc. 32-18; App. 429: R. Doc. 32-20) Rather than interviewing the witnesses Tobacco identified or conducting a broader inquiry, Frederick talked with Tobacco and then concluded that Tobacco's workplace challenges stemmed from others' frustration with her directives rather than from discriminatory or retaliatory conduct. (App. 434: R. Doc. 32-22) This superficial – or dismissive -- treatment of a serious complaint, triggers a credibility

21

determination, especially when Frederick shared her complaint with Elliott, with a notation that it was for her HR file.  Since Frederick was the HR partner, and presumably maintained the HR files, it is unclear why this email was also sent it to Elliott.  This creates a credibility determination that cannot be resolved as a matter of law. *Torgerson*, 643 F.3d at 1042–43.

Within the month,  Tobacco was terminated. During her termination call, Tobacco asked: "Is this because of discrimination, that I reported to you, the racism?" (App. 150: R. Doc. 32-1, Tobacco Depo at 50). Although that question reflects her perception, the sequence of events is undisputed: complaints of racism, retaliation, and disparate treatment were raised, shared internally among the decision-maker and HR, and termination followed shortly.   A reasonable jury could consider whether the timing and handling of Tobacco's complaints undermine Avera's insistence that her termination was purely budget-driven.

When considered cumulatively, Tobacco's evidence presents a coherent narrative: a high performing senior employee, a discretionary and inconsistently described RIF decision; absence of objective selection criteria;  a stark mismatch between the description for the budget cut and the process for selecting Tobacco;  a wide departure from Avera's carefully considered written RIF policy even though the decision-maker was told to use it; ongoing hiring for open positions during a RIF;  exclusion from meetings where departmental information was shared with

22

other similarly situated managers; and uneven application of job duties and conditions of safety in the workplace; symbolic elevation of Tobacco's status coupled with internal marginalization; and largely ignored complaints of discrimination that were shared with the decisionmaker for filing rather than investigation very shortly before Tobacco's sudden and immediate termination.

## **CONCLUSION**

Perhaps none of these facts, standing alone, would compel a verdict for Tobacco. But that is not the summary-judgment standard. A reasonable jury, viewing the facts most favorably to Tobacco, could disbelieve Avera's explanation and infer that discrimination was a motivating factor. *Reeves*, 530 U.S. at 147. Because competing inferences and credibility determinations must be resolved by a jury—not the court—summary judgment is inappropriate. Because the record contains genuine disputes of material fact and credibility issues that must be resolved by a jury, the summary judgment should be reversed and the case remanded for trial.

Dated this 21st day of February, 2026.

/S Stephanie E. Pochop
Stephanie E. Pochop
JOHNSON POCHOP & BARTLING

23

LAW OFFICE, LLP
405 Main Street
Gregory, SD  57533
(605) 835-8391
Stephanie@Rosebudlawyers.com
*Attorney for Plaintiff-Appellant*
*Deborah Tobacco*

24

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 21, 2026, I electronically submitted the foregoing Appellant's Reply Brief for Review with the Clerk of the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/S Stephanie E. Pochop
Stephanie E. Pochop
*Attorney for Plaintiff-Appellant*
*Deborah Tobacco*

25

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5183 words and 469 lines.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office 365 Word in 14-point Times New Roman font.

Pursuant to Eighth Circuit Local Rule 28A(b)(2), this brief has been scanned for viruses and is virus-free.

Dated this 21st day of February, 2026.

_/S Stephanie E. Pochop_____

Stephanie E. Pochop
*Attorney for Plaintiff-Appellant*
*Deborah Tobacco*

26

Appellate Case: 25-2881    Page: 30    Date Filed: 02/24/2026 Entry ID: 5611555